919 P.2d 969

Harry Michael MATHEWSON,
Plaintiff–Appellee,

v.

ALOHA AIRLINES, INC.,
Defendant–Appellant,

and

John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; or other Entities 1–20, Defendants.

No. 16583.

Supreme Court of Hawai'i.

July 1, 1996.

**59**

Robert S. Katz (Richard M. Rand with him on the brief; Torkildson, Katz, Jossem, Fonseca, Jaffe, Moore & Hetherington), on the briefs, Honolulu, for defendant-appellant Aloha Airlines, Inc.

Jerry M. Hiatt (Craig K. Shikuma, Alan K. Lau and Paul M. Saito with him on the brief; Bays, Deaver, Hiatt, Kawachika & Lezak), on the briefs, Honolulu, for plaintiff-appellee Harry Michael Mathewson.

Before MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., MARIE N. MILKS, Circuit Court Judge in place of KLEIN, J., recused.

LEVINSON, Justice.

In these consolidated proceedings, the defendant-appellant Aloha Airlines, Inc. (Aloha) appeals the First Circuit Court's orders (1) denying Aloha's motion, filed pursuant to Hawai'i Revised Statutes (HRS) § 658–9 (1993),[1] to vacate an arbitration award and (2) granting the plaintiff-appellee Harry Michael Mathewson's motion, filed pursuant to HRS § 658–8 (1993),[2] to confirm the award and "modifying" it pursuant to HRS § 658–10 (1993).[3]

1. HRS § 658–9 provides:

**Vacating award.** In any of the following cases, the court may make an order vacating the award, upon the application of any party to the arbitration:

(1) Where the award was procured by corruption, fraud, or undue means;

(2) Where there was evident partiality or corruption in the arbitrators, or any of them;

(3) Where the arbitrators were guilty of misconduct, in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence, pertinent and material to the controversy; or of any other misbehavior, by which the rights of any party have been prejudiced;

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award, upon the subject matter submitted, was not made.

Where an award is vacated and the time, within which the agreement required the award to be made, has not expired, the court may in its discretion direct a rehearing by the arbitrators.

2. HRS § 658–8 provides in relevant part:

**Award; confirming award.** The award shall be in writing and acknowledged or proved in like manner as a deed for the conveyance of real estate, and delivered to one of the parties or the party's attorney. A copy of the award shall be served by the arbitrators on each of the other parties to the arbitration, personally or by registered or certified mail. At any time within one year after the award is made and served, any party to the arbitration may apply to the circuit court specified in the agreement, or if none is specified, to the circuit court of the judicial circuit in which the arbitration was had, for an order confirming the award. Thereupon the court shall grant such an order, unless the award is vacated, modified, or corrected, as prescribed in sections 658–9 and 658–10. . . .

3. HRS § 658–10 provides:

**Modifying or correcting award.** In any of the following cases, the court may make an order modifying or correcting the award, upon the application of any party to the arbitration:

(1) Where there was an evident miscalculation of figures, or an evident mistake in the description of any person, thing, or property, referred to in the award;

(2) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted;

(3) Where the award is imperfect in a matter of form, not affecting the merits of the controversy.

On appeal, Aloha argues that the circuit court committed reversible error because: (1) it lacked jurisdiction to enter any orders (including an order approving the parties' stipulation to arbitrate their dispute) or confirm the arbitration award until a certified order remanding Civil No. 89–2522 from the United States District Court from the District of Hawai'i—to which the matter had been removed—had been officially filed in the circuit court record, as allegedly required by 28 U.S.C. § 1447(c); (2) it confirmed—rather than vacated—the arbitration award notwithstanding that the arbitrator "had violated HRS § 658–9(4) by deciding an issue not submitted to him, namely, Mathewson's claim for breach of an implied contract [as set forth] in Count III of [Mathewson's] [c]omplaint[,] which had already been dismissed"; (3) it confirmed—rather than vacated—the arbitration award notwithstanding that the arbitrator "had refused to hear evidence pertinent and material to the controversy in violation of HRS § 658–9(3) and ... to decide the issue submitted to him in violation of HRS § 658–9(4)"; and (4) it modified the arbitration award, pursuant to HRS § 658–10, although "no motion to modify had been filed under HRS § 658–10 within [ten] days after service of the [a]rbitration [a]ward as required by HRS § 658–11 [ (1993) ],[4] and the only [m]otions before the [circuit] [c]ourt were to [v]acate the [a]ward pursuant to HRS § 658–9 or [c]onfirm it pursuant to HRS § 658–8."

For the reasons set forth below, we deem Aloha's points of error to be without merit. Accordingly, we affirm the circuit court's orders.

## I. BACKGROUND

### A. Preliminary Events And Initial Proceedings

Beginning in June 1988, Mathewson entered Aloha's employ as an airline pilot. On May 11, 1989, approximately two weeks prior to the end of his one-year probationary period, Aloha removed Mathewson from flight status and, effective May 15, 1989, terminated him on the sole basis that his evaluations had not been satisfactory. Aloha had given Mathewson no advance notice of any anticipated termination, no termination hearing, no severance pay, and no explanation for his termination other than that his peer-pilot evaluations had been unsatisfactory. Moreover, despite his requests to do so, Aloha declined to allow Mathewson to review the evaluations that had allegedly served as the basis for his termination.

On August 15, 1989, Mathewson filed a wrongful termination complaint against Aloha in the First Circuit Court. Mathewson's complaint alleged, inter alia, that, because he had previously been "blacklisted" by the pilots' union—the Air Line Pilots Association (ALPA)—for having worked as a pilot for another airline during an ALPA strike, certain ALPA members who were employed by Aloha had engaged in conduct calculated to force his termination or resignation[5] and

---

The order may modify and correct the award, so as to effect the intent thereof, and promote justice between the parties.

4. HRS § 658–11 provides in relevant part:
 **Notice of motion to vacate, modify, or correct; stay.** Notice of a motion to vacate, modify, or correct an award, shall be served, in the manner prescribed for service of notice of a motion in an action, upon the adverse party or the adverse party's attorney within ten days after the award is made and served. . . .

5. Mathewson described the substance of his allegations in this regard in a letter, dated November 25, 1988, addressed to Tom Derieg, one of Aloha's vice presidents. The letter stated in relevant part:
 My name is Harry Mathewson and am a pilot hired in the June 1988 class here at Aloha. Regarding my employment, there is a

unique situation that at this time I believe management needs to be made aware of.
 During the end of 1983 and part of 1984 I flew for an airline that was experiencing labor difficulties. The carrier was represented by ALPA, which is also the union representative for Aloha. Since taking the line at Aloha I have frequently experienced animosity by other pilots on the job. Where I take exception to the situation is when my personal property is destroyed and my professionalism as a pilot and safety of the passengers I fly is compromised.
 This is beginning to be the case, and I would like to arrange a meeting to discuss the situation and the alternatives that are open to myself and Aloha Airlines.
 This harassment has become an untenable situation and needs to be addressed by both parties as expeditiously as possible.

that the only reason for his discharge was that Aloha had succumbed to pressure exerted by ALPA to blacklist and terminate him. The complaint asserted the following claims for relief: (1) discharge in violation of public policy (Count I); (2) promissory estoppel (Count II); (3) breach of contract, express and implied (Count III); (4) negligent and/or intentional misrepresentation and/or fraud (Count IV); and (5) intentional and/or negligent infliction of emotional distress (Count V).

On September 29, 1989, Aloha removed Civil No. 89–2522 to the United States District Court for the District of Hawai'i, which redesignated the matter as Civil No. 89–00758 DAE. Mathewson filed a motion for remand in the federal district court on October 28, 1989, and, on March 19, 1990, the district court granted Mathewson's motion and entered an order remanding the matter to the First Circuit Court. On March 21, 1990, the chief clerk of the federal district court transmitted a letter to the chief clerk of the First Circuit Court advising the latter that the "case was remanded to the Circuit Court of the First Circuit, State of [Hawai'i]" and enclosing a certified copy of the district court's remand order. The circuit court clerk acknowledged receipt of the transmittal letter and remand order on March 23, 1990. However, apparently through inadvertence, the certified remand order was not filed in the circuit court record until February 22, 1993. Nevertheless, Aloha has conceded in its opening brief that it "does not dispute that the Clerk of the United States District Court ... *mailed* a *certified* copy of the Order of Remand to the Clerk's Office for the Circuit Court of the First Circuit and that such Order was received." (Emphases added.)

On May 10, 1990, Aloha filed a motion to dismiss Civil No. 89–2522 on the grounds that it was "preempted by the Railway Labor Act ('RLA'), 45 U.S.C. § 151[,] and that [Mathewson] has failed to initiate or exhaust his exclusive contractual remedies under the [c]ollective [b]argaining [a]greement between Aloha and the Air Line Pilots Association ('ALPA')." Attached as Exhibit B to Aloha's motion was a copy of the federal district court's remand order. Aloha explained in its supporting memorandum that it had "removed this action to the federal district court" and that, thereafter, Mathewson had "filed a Motion to Remand[,] which was granted by Order dated March 19, 1990 (attached as Exhibit B)." Mathewson opposed the motion, arguing, *inter alia,* that federal law did not preempt his state law claims.

On July 12, 1990, the circuit court granted Aloha's motion in part and denied it in part. Noting that "the authorities are apparently in agreement that only claims which hinge on the application or interpretation of the collective bargaining agreement are subject to federal preemption," the circuit court entered the following dispositional order:

1. [Aloha's] [m]otion is *granted with respect to Count III* (Breach of Contract) of [Mathewson's] [c]omplaint *and such of Count IV* (Negligent and/or Intentional Misrepresentation and/or Fraud) *and such of Count V* (Intentional and/or Negligent Infliction of Emotional Distress) *as relate to or are parasitic of the claims under Count III.*

2. [Aloha's] [m]otion is *denied with respect to Count I* (Discharge in Violation of Public Policy) *and Count II* (Promissory Estoppel) *and such of Counts III and V as relate to or are parasitic of the claims under Counts I and II.*

(Emphases added.)

Subsequently, on March 18, 1992, the parties entered into a court-approved stipulation, which was officially filed in the circuit court record in Civil No. 89–2522, to arbitrate Mathewson's surviving claims. The stipulation to arbitrate provided in relevant part:

IT IS HEREBY STIPULATED by the parties hereto, by and through their respective counsel, as follows:

1. ... [T]he parties hereby stipulate that they will arbitrate this matter. The arbitration shall be final and binding *as to all claims* and defenses *which were raised or which could properly have been raised in this matter.*

2. In consideration for the submission to arbitration, *[Aloha]* waives any defenses

to jurisdiction based on preemption in this matter, but *retains its right to defend against [Mathewson's] claims on the merits* based on its collective bargaining agreement and statutory provisions.

3. The arbitration shall be before a single neutral arbitrator from [Hawai'i] selected from a list supplied by the American Arbitration Association ("AAA")....

. . . .

5. *[Hawai'i] law shall apply to the arbitration* and the arbitration shall otherwise be governed by the applicable rules of the AAA. The parties shall have the same burdens of proof as they would have had at trial on all issues.

. . . .

7. *The arbitration in the above-captioned proceeding is meant to replace a trial by jury on all issues herein. The civil suit shall be stayed by stipulation pending the completion of the arbitration for the purposes of confirming or vacating or otherwise acting upon the arbitration award.* Any arbitration award may be confirmed as a final judgment by a motion made in Civil No. 89–2522 ... pursuant to Chapter 658 of the [Hawai'i] Revised Statutes....

. . . .

9. ... *This agreement shall be construed in accordance with [Hawai'i] law* and any litigation to enforce the terms of this agreement shall be decided by the Circuit Court of the First Circuit, State of Hawai'i....

(Emphases added.)

### B. *Result Of Arbitration*

Pursuant to the stipulation, the parties selected Ted T. Tsukiyama as the arbitrator and proceeded to arbitration. On May 8, 1992, Tsukiyama issued a "Preliminary Arbitration Decision and Award" (Preliminary Decision). The Preliminary Decision identified the "issues submitted for determination" as being "those ... set forth in Count I (Discharge in Violation of Public Policy), Count II (Promissory Estoppel), Count IV (Negligent and/or Intentional Misrepresentation and/or Fraud), and Count V (Intentional and/or Negligent Infliction of Emotional Distress)[.]"

After a lengthy recitation of the "background facts," the Preliminary Decision addressed the question of Aloha's liability in relevant part as follows:

The Arbitrator finds and determines the issue of liability in favor of [Mathewson] and against [Aloha] based on one or more of the four counts of the Complaint. The evidence in this case supports a finding of liability against [Aloha] upon the causes alleged in Count V (Negligent Infliction of Emotional Distress) and Count I (Violation of Public Policy) and probably those alleged in Count II (Promissory Estoppel) and [Count IV] (Negligent Misrepresentation). A summary of findings and reasoning follows:

. . . .

3. *Outside Performance Record.* [Aloha] sought to introduce and underscore certain portions of [Mathewson's] experience and record at [another airline] to derogate his pilot competency, while [Mathewson] sought to introduce his post-determination flying record at [yet another air carrier] and other positive testimonials of his good or satisfactory flying abilities and record elsewhere.

*All of this massive evidence will be disregarded and excluded on grounds of relevancy,*[6] since the prime and sole focus of this arbitration centers upon the propriety

---

**6.** Pursuant to Hawai'i Rules of Evidence (HRE) Rule 402, "[e]vidence which is not relevant is not admissible." ...

HRE Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

*State v. Malufau,* 80 Hawai'i 126, 129, 906 P.2d 612, 615 (1995).

This court reviews questions of relevancy, within the meaning of ... []HRE[] Rules 401 ... and 402 under the "right/wrong" standard, inasmuch as the application of those rules "can yield only one correct result." *Kealoha v. County of Hawaii,* 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993).

*State v. Wallace,* 80 Hawai'i 382, 409, 910 P.2d 695, 722 (1996) (footnotes omitted).

of [Mathewson's] termination at Aloha Airlines, and none of these matters were considered nor constituted factors in [Aloha's] decision to terminate, which was based solely upon the negative evaluations filed against [Mathewson] by Aloha's line captains....[7]

. . . .

5. *Competency.* [Aloha] argues this is simply and solely a competency case. [Mathewson] argues that the sole issue to be decided is whether he was a competent pilot. Both are wrong. The Arbitrator cannot reach the competency issue until he first resolves the threshold issue of whether [Aloha's] evaluation of [Mathewson's] performance was properly, fairly, [and] objectively undertaken, free of bias and discrimination. This [Preliminary] Decision does not address or speak to the competency of [Mathewson] because it finds the threshold issue to be decided in the negative, requiring the evaluation decision against [Mathewson] to be nullified and set aside. At plain face value, ten negative evaluations would strongly question and derogate [Mathewson's] pilot qualifications, but not when both raters and the rating process are found to be contaminated with discriminatory motivation and bias. Nor does this [Preliminary] Decision find [Mathewson] to be competent. Thus, *all evidence pro and con as to [Mathewson's] competency is* found to be and becomes *wholly irrelevant,* and must be disregarded.[8]

6. *Evaluation Process. The subject termination* in this case must be found improper and invalid and be set aside because it *was based upon evaluations made by biased evaluators reaching or render-ing transparently biased conclusions,* a product of a discriminatory campaign of harassment or retaliation against [Mathewson] for previously crossing an ALPA picket line. Pilot harassment per se is not found to be significant to the issue because [Mathewson] was not terminated through or because of harassment. The very evident and undisputed harassment in this case is important only to establish the environment of pilot hostility encountered by [Mathewson], culminating in the negative evaluations as the ultimate and terminal act of harassment inflicted upon him.

. . . .

The evaluation forms ... were transparently permeated with negative bias and motivation to downgrade [Mathewson's] line performance, with obvious bent upon disparagement ranging from the blunt ravage of a meat axe to the finesse of a surgical scalpel.... The overall impression and conclusion to be drawn from these 10 negative ratings is that the rators [sic] were "out to get the scab", which they successfully accomplished through the evaluation process.... The total evaluation process as applied ... to [Mathewson] must be found fatally infected with bias and bad faith, and its results wholly rejected.

[Aloha's] pilot evaluation process in general is not being condemned here. It has only failed in this specific instance.... But [the] pilot evaluation system loses its legitimacy and is predestined to bankrupt failure when the subject happens to be a "blacklisted scab" known, despised[,] and targeted by his peer reviewers for punishment and removal at any price..... The

---

7. We note that, at paragraph 1 of Aloha's answer to Mathewson's complaint, Aloha expressly admitted Mathewson's factual allegation that he "was terminated ... for the sole reason that his evaluations were not satisfactory." *See* Hawai'i Rules of Civil Procedure (HRCP) Rule 8(b) ("A party ... shall admit or deny the averments upon which the adverse party relies."); HRCP 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."). "The theory of Rules 8(b) and 8(d) is that a defendant's pleading should apprise the opponent of the allega-tions in the complaint that stand admitted and will not be in issue at trial and those that are contested and will require proof to be established to enable [the] plaintiff to prevail." 5 C. Wright & A. Miller, Federal Practice and Procedure: Civil 2d § 1261, at 383 (1990) (footnote omitted). *See also National Ass'n of Life Underwriters, Inc. v. Commissioner of Internal Revenue,* 30 F.3d 1526 (D.C.Cir.1994) (recognizing that admissions in pleadings are binding on party who made them).

8. *See supra* notes 6 and 7.

system as applied in this case knowingly and consciously tolerated the installation of "a fox to guard the henhouse". [Aloha] cannot now be heard to proclaim its guiltlessness when the chicken is gone and only the fox with a bloated belly remains.... Ultimately, it was [Aloha's] evaluation process to manage and control, ... resting squarely upon it to formulate and apply a fair and objective method of evaluation, contamination-proof from [a] "blacklist mentality".... The termination of [Mathewson], based upon those fatally defective evaluations, must therefore be set aside.

7. *Count V—Intentional/Negligent Infliction of Emotional Distress.* [Aloha] is not being held responsible for the "blacklisting" of [Mathewson] nor for the acts of harassment directed at [Mathewson]. But at the very minimum, it should be held responsible, and therefore liable, for its discharge action based upon its knowing acceptance and adoption of negative evaluations filed by peer pilots seeking [Mathewson's] removal from [Aloha's] employ in effectuation of their "blacklist" against him and in retaliation for his prior crossing of an ALPA picket line.

*The wellspring of [Aloha's] vulnerability in this case is to be found in the notice and knowledge it acquired as to [Mathewson's] "blacklisted" background, the pilot[s'] aggravation [over] his presence[,] and their hostile harassing reactions thereto, climaxing in an extraordinary outpouring of negative ratings that [Aloha] knew or should have known were infected with bias[ ] yet knowingly accept[ed] ... as legitimate performance evaluations by reaching a collective management decision to terminate him. ...*

Such notice and knowledge gave rise to an affirmative obligation or duty to evaluate [Mathewson] fairly and objectively, but which duty was not fulfilled. The same notice and knowledge made predictable and foreseeable the likely and probable consequences of any decision to terminate, particularly after assurances of fair treatment had been earlier made to [Mathewson] by [Aloha]. The consequences were not only foreseeable but preventable, [Aloha,] by its own admission[,] having several opportunities to have forestalled the likely results of its termination.... [Aloha] must therefore accept responsibility for the emotional distress suffered by [Mathewson] following the decision to terminate, knowingly and deliberately made, which aftershock is found to be real, unfeigned[,] and serious.... That termination ... must be considered the proximate cause of the emotional ailments that followed....

8. *Count I—Termination in Violation of Public Policy.* It is found that [Aloha's] discharge of [Mathewson] was in contravention of a clear public policy against "blacklisting" and discrimination in the hiring, tenure[,] or other conditions of employment with regard to nonmembership in a labor organization or the right to refrain from labor activities, as proscribed by both State and Federal labor law and policy. The "public policy" exception to at-will terminations enunciated by the *Parnar* rule [in *Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 652 P.2d 625 (1982),] is found applicable and is hereby adopted.[9]

The acceptance and adoption by [Aloha] of bias-tainted evaluations made by its pilot evaluators[,] in furtherance and effectuation of their "blacklisting" effort

---

**9.** In *Parnar,* this court adopted the "public policy exception" to the doctrine of "employment at will"—pursuant to which "an employer is subjected to tort liability if [its] discharge of an employee contravenes some well-established public policy"—, holding as follows:

> [A]n employer may be held liable in tort where [its] discharge of an employee violates a clear mandate of public policy. In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or

purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject. Of course, the plaintiff alleging a retaliatory discharge bears the burden of proving that the discharge violates a clear mandate of public policy.

*Parnar,* 65 Haw. at 377, 380, 652 P.2d at 629, 631 (footnote omitted).

to remove [Mathewson] from [Aloha's] employment[,] and the decision to actually discharge him based on such tainted evaluations constituted an act of respecting, supporting, abetting[,] and enforcement of a "blacklist", in contravention of clear public policy encompassed in HRS [§ ] 377–6[10] and Section 8 of the National Labor Relations Act.... The interests in this case sought to be protected by this public policy principle is found to be a *public or societal* interest rather than a purely individual or personal interest. By its discharge action based upon pretextual pilot ratings, [Aloha] acted discriminatorily against [Mathewson] [—] knowing [that] he was the target of concerted "blacklist" objectives of the pilots and their union [—and] therefore in contravention of recognized public policy disfavoring the same.

[Aloha's] argument that HRS [§ ] 377–6 relates to "unfair labor practices" ... which should be filed in the State Labor Relations Board is off mark. [Mathewson] is not [filing] and has not filed an "unfair labor charge". He has filed a common law action in tort in the civil courts based on the count [entitled] "discharge in violation of public policy[,]" which [public policy] is found or defined in the letter or purpose of statutory labor law and policy, such as HRS [c]hapter 377 and the National Labor Relations Act. It is found that *[Mathewson] has filed an actionable cause of action in tort alleging and establishing that he was discharged by [Aloha] in violation of a clear mandate of public policy.*

*In a related claim* ..., [Mathewson] has alleged [that] his discharge was in violation of a specific Company Flight Operations Manual provision.... Here, *the "implied contract" exception to the at-will doctrine appears to apply* .... [Mathewson's] discharge, based upon bias-tainted, pretextual evaluations[,] which did not address his "individual merits and qualifications" in a fair, objective manner, ran counter to the intent and purpose of ... the Manual.

9. *Count II[—] Promissory Estoppel [—] and Count IV[—] Intentional and/or Negligent Misrepresentation and/or Fraud.* ...

....

... [Aloha] clearly promised and assured [Mathewson] that he would be judged on his performance and not his past at [another airline], that on any unfavorable evaluations [Aloha] "would consider the source" and would take them "with a grain of salt" in case of bias, and that he "would be treated fairly" in the evaluation process. Whatever was in fact said and heard ..., the bottom line was that [Mathewson was] left ... feeling assured that, notwithstanding his ... "blacklist" status, he would be fairly evaluated. The assurances were sufficient for him to continue his probationary employment, even after accepting employment with the knowledge that he must pass a probationary period evaluated by peer ALPA-member pilots and after experiencing 6 month's [sic] of "blacklist harassment".... [Mathewson] in effect told [Aloha that] he would endure and tolerate harassment but specifically sought assurances that he would be protected or insulated from bad faith pilot ratings used to terminate him. Whatever was said ... was sufficient to induce [Mathewson] to stay on, despite the stain of the "blacklist" upon him....

By [Aloha's] acceptance and adoption of the 10 negative evaluations filed against [Mathewson] in its discharge action ..., it is found that [Aloha] failed to live up to

---

**10.** HRS § 377–6 (1993) provides in relevant part:

 **Unfair labor practices of employers.** It shall be an unfair labor practice for an employer individually or in concert with others:

 (1) To interfere with ... the employer's employees in the exercise of the rights guaranteed in section 377–4; [or]

 ....

 (11) To make, circulate, or cause to be circulated a blacklist[.]

HRS § 377–4 (1993), entitled "Rights of employees," provides in relevant part that "[e]mployees shall have ... the right to form, join, or assist labor organizations ... and to engage in lawful, concerted activities for the purpose of ... mutual aid or protection, and such employees shall also have the right to refrain from any and all such activities[.]"

[its] promises and assurances made to [Mathewson].... The fact[s] ... persuasively demonstrate that, even if it discounted the obviously biased ratings, [Aloha's] acceptance of the other ratings at face value did not "consider the source[,]" [i.e.,] that these were rendered by "blacklist oriented" ALPA pilots[,] nor were these ratings[,] which were transparently permeated with bias "taken with a grain of salt".... Whatever the explanations or rationalizations offered, the inescapable bottom line conclusion must be that the clear promise and assurance made by [Aloha] ... that [Mathewson] would be "fairly evaluated" and "would receive fair treatment" was not reflected [or] encompassed in its termination of [Mathewson]....

Thus, *Count II of the [c]omplaint is found to be established to the extent that [Aloha's] promise and assurance of fair evaluation and treatment was reasonably expected to[,] and did in fact, induce [Mathewson] to continue to hang in on his harassment-ridden probationary period... to his ultimate detriment when [Aloha] failed to deliver on its promise.*
...

... Count IV of the [c]omplaint present more difficult problems of interpretation, since it would require a finding that the promises and assurances of fair treatment made by [Aloha] constituted untrue or false representations or misrepresentations intended to induce [Mathewson] to continue in the employ of [Aloha] to his ultimate detriment and damage. Charges of "intentional and/or negligent fraud" are not found in the record of this case[ ] and shall be dismissed.

While the representations made by [Aloha] ... assuring fair treatment ultimately turned out to be untrue, the problem is to ascertain whether such representations were known to be untrue at the time they were made, which would require probing into the subjective intent or mindset of those who so represented.... Apparently, all [of Aloha's] management representatives never intended to disregard the pilot ratings, since they all insisted that none of them ever promised that the ratings would not be considered.... Thus[,] [Aloha]

should have forthrightly stated [that] "we intend to rely on pilot evaluations, come what may", if that was its state of mind at the time. [Aloha] got into this "misrepresentation" bind because it made representations it could not deliver upon later. Whether such misrepresentations were intentionally made may be arguable, but at the least [they] must be considered as [having been] negligently made, since [Aloha] knew or should have known that the pilot evaluations [that] it would receive would be permeated with "blacklist mentality" and would not constitute "a fair evaluation" as promised.

10. *Conclusion.* ...

The record in this case overwhelmingly eviden[ces] that the pilot evaluations relied upon by [Aloha] to base its termination of [Mathewson, which] was the ultimate act of "blacklist harassment" by peer pilots against him, were fatally contaminated with "anti-scab" bias, [thus] rendering [their] putative opinions of non-competence an obvious pretextual cover to rid [Aloha] of a despised "scab". These conclusions are so transparently obvious, even to this casual outsider, that it is a source of wonderment that [Aloha's] management officials on watch throughout could not have, either by naivete, insensitiv[ity], indifference, or plain stupidity, discerned that its evaluation process was being made a travesty.... [A] realistic reconstruction of [Aloha's] fatal decision would point to a rational hypothesis that, as [Mathewson's] probationary period neared completion and [Aloha] was deluged with negative evaluations and mounting pilot discontent and resentment against [Mathewson's] continuing presence with [Aloha], [Aloha] realized the enormity of its problem and predicament of retaining a "strikebreaker" in its permanent employ[,] which would exacerbate pilot unrest, create "cold cockpits" whenever [Mathewson] flew ... [,] compromise flight efficiency and safety, and seriously impair [Aloha's] relations with ALPA, [notwithstanding that Aloha had] no real, bona fide concern over [Mathewson's] competence as a pilot. Confronted with this excruciating dilemma, the prag-

matic solution [that Aloha] reached was to finally separate the pariah from its employment as the lesser of two evils. [Although Aloha's] perception that it had absolute authority to terminate a probationer or at-will employee might have influenced its choice, ... the law ... recognizes a modicum of protection for probationers and at-wills[,] and they cannot be severed from employment discriminatorily or in violation of public policy....

(Some emphases in original and some added.)

The Preliminary Decision accorded the parties a seven-day opportunity to negotiate, mediate, or mediate/arbitrate the issue of Mathewson's damages and reserved jurisdiction to resolve the question if the parties failed to do so themselves. The foregoing independent modes of dispute resolution proved unsuccessful, and Tsukiyama issued a final arbitration decision and award (Final Decision) on July 16, 1992. Regarding Aloha's liability, the Final Decision incorporated the Preliminary Decision by reference. As to economic relief, the Final Decision awarded Mathewson compensatory damages—general and special—in the undifferentiated amount of $800,000.00, prejudgment interest from the date Mathewson filed his complaint, postjudgment interest as provided by law, and costs in the amount of $29,062.30. In addition, the Final Decision ordered the following non-economic relief:

1. The discharge of [Mathewson] effective May 15, 1989 shall be nullified and set aside, and the termination letter dated May 11, 1989 and all personnel records relating to said discharge, including evaluations made during his probationary period, shall be destroyed or expunged from [Aloha's] files and records.

2. [Mathewson's] employment status with [Aloha] shall be "on indefinite leave of absence", subject to renewal and to any other limitation as provided under [the] Collective Bargaining Agreement. Responses to any inquiries concerning [Mathewson's] current status with [Aloha] shall be that [Mathewson] is "on indefinite leave of absence for personal reasons". Any responses to inquiries concerning [Mathewson's] employment and status with [Aloha], past, present[,] or future, shall be made, and [Aloha's] records shall so reflect and provide, without any reference or allusion to his competency as a pilot with [Aloha].

### C. Post–Arbitration Events And Proceedings

On July 24, 1992, pursuant to HRS § 658–9, see supra note 1, Aloha filed a motion to vacate the arbitration award—as embodied in the Final Decision—on the ground that Tsukiyama had "exceeded his authority by deciding questions not submitted to him[, i.e., the merits of Mathewson's Count III breach of implied contract claim that had previously been dismissed,] and by refusing to hear evidence pertinent and material to the controversy," i.e., the evidence relating to Mathewson's prior performance as a pilot for another airline. Three days later, pursuant to HRS § 658–8, see supra note 2, Mathewson filed a motion to confirm the arbitration award and for judgment to be entered, pursuant to HRS § 658–12 (1993),[11] in accordance therewith. Both motions were set to be heard on August 11, 1992. On August 10, 1992, Mathewson commenced a special proceeding, denominated S.P. No. 92–0333, in

---

11. HRS § 658–12, entitled "Entry of judgment," provides that, "[u]pon the granting of an order, confirming, modifying, or correcting an [arbitration] award, the same shall be filed in the office of the clerk of the circuit court and this shall constitute the entry of judgment. An appeal may be taken from such judgment as hereinafter set forth." Correlatively, HRS § 658–14 (1993) provides:

 **Effect of judgment.** The judgment entered in accordance with section 658–12 has the same force and effect, in all respects as, and is subject to all the provisions of law relating to, a judgment in an action; and it may be enforced, as if it had been rendered in an action in the court in which it is entered.

Finally, HRS § 658–15 (1993) provides in relevant part that "[u]nless the [arbitration] agreement for award provides that no appeal may be taken[,] an appeal may be taken from an order vacating an award, or from a judgment entered upon an award, as from an order or judgment in an action[.]"

which he filed a separate motion to confirm the Preliminary and Final Decisions.[12]

During the August 11, 1992 hearing, counsel for Aloha advanced, *inter alia*, the following argument:

Now, Your Honor, there was also some brief reference to the non[-]economic claims. I think the things that are particularly disturbing is [sic] not only that these claims were not ever submitted to the arbitrator, Your Honor, but also ... the decision of the arbitrator ... in effect amounts to a gag order on Aloha ... and a requirement that Aloha destroy personnel files *which could clearly violate federal and state requirements.*

As Your Honor knows, the federal regulatory scheme that regulates the airline industry not only imposes on the airlines the duty to certify the competency of their pilots, but [also] to provide information to the FAA as and when requested regarding pilots. Your Honor, ... *the arbitrator's gag order would effectively require us to have to come into court to get a court order to overrule that gag order in order to comply with our obligations under [the] federal regulatory scheme.*

[Mathewson's counsel has suggested]—I think in a moment of honest retrospection [—] that[,] well, maybe this was improper by the arbitrator. And the way for Your Honor to resolve that problem is to simply sever that portion of the award out under [HRS § ] 658–10. The problem, Your Honor, is that [HRS § ] 658–10 requires a motion to be made within 10 days. No such motion was ever made in this case.

(Emphases added.)

At the conclusion of the hearing, and having heard argument from both sides, the circuit court granted Mathewson's motion to confirm, denied Aloha's motion to vacate, and announced the following oral ruling:

In my review of the records and files and decision of the arbitrator, I first note that my powers are limited by statute. In this particular case[,] when I review an arbitration award[,] I'm bound by the language of [HRS ch.] 658, including ... [HRS §§ ] 658–8[,] which relates to the confirmation of [an] award[,] 658–9, which relates to vacating [an] award[,] and 658–10, which relates to moidification [sic] and correction.

To get to the heart of the matter[,] I've reviewed the decision of the arbitrator very, very carefully. It appears to me that the arbitrator's decision was well thought out, well reasoned, and based upon adequate evidence. Furthermore, looking at [HRS § ] 658–9, which realtes [sic] to the reason for vacating an award, I do not find that any of those sections apply. I find that the award should be confirmed. Therefore I will confirm the award, with one change.... I believe that I have the power under the statute to modify the award[,] and I will modify the award as follows: To the extent that the arbitrator's award requires Aloha ... to violate any federal law or regulation, [the] award is modified so as to reflect [that] ... Aloha ... will not have to violate ... federal or state regulations relating to reporting or keeping records. In all other respects[,] the motion to vacate is denied. The motion to confirm is granted.

. . . .

I am not making any comment, whatsoever, [regarding whether the award would obligate Aloha to violate federal law] because I don't know what the federal law is.

On October 6, 1992, the circuit court entered identical written orders in Civil No. 89–2522 and S.P. 92–0333 denying Aloha's motion to vacate the arbitration award. Orders granting Mathewson's motions to confirm the arbitration award were entered on October 28, 1992, subject to the following "modification":

The Court modifies[ ] the Arbitrator's Award[,] pursuant to [HRS § ] 658–10[,] as follows: [Aloha] need not comply with the non-economic remedies set forth in the Arbitrator's Award to the limited extent that compliance with said non-economic remedies would cause [Aloha] to violate any State or Federal statutes, laws, or

---

12. During the August 11, 1992 hearing, the circuit court consolidated Civil No. 89–2522 and

S.P. No. 92–0333 with the concurrence of both parties.

regulations. In all other respects, the non-economic remedies and other remedies granted by the Arbitrator remain in full force and effect.

Judgments in the consolidated matters were entered on November 16, 1992 in favor of Mathewson and against Aloha. The judgments awarded Mathewson the economic and non-economic relief set forth in Tsukiyama's Final Decision, subject to the "modification" described in the circuit court's confirmation orders.[13]

Aloha has timely appealed the circuit court's orders.

## II. STANDARDS OF REVIEW

### A. Subject Matter Jurisdiction

■ Whether a circuit court possesses subject matter jurisdiction over a dispute relating to arbitration, including the threshold issue of arbitrability, is a question of law reviewable *de novo*. *Bateman Constr., Inc. v. Haitsuka Bros., Ltd.*, 77 Hawai'i 481, 484, 889 P.2d 58, 61 (1995); *Norris v. Hawaiian Airlines, Inc.*, 74 Haw. 235, 239, 842 P.2d 634, 637 (1992), *aff'd,* — U.S. —, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). "The 'lack of subject matter jurisdiction can never be waived by any party at any time.'" *Housing Fin. and Dev. Corp. v. Castle,* 79 Hawai'i 64, 76, 898 P.2d 576, 588 (1995) (quoting *Chun v. Employees' Retirement Sys.,* 73 Haw. 9, 14, 828 P.2d 260, 263, *reconsideration denied,* 73 Haw. 625, 829 P.2d 859 (1992)). Thus, a court may inquire into the issue of subject matter jurisdiction at any stage of the case. *Chun,* 73 Haw. at 14, 828 P.2d at 263.

### B. HRS Ch. 658 Arbitration Awards

■ Our review of ... arbitration awards ... is circumscribed by the well-established rule that "[b]ecause of the legislative policy to encourage arbitration and thereby discourage litigation, judicial review of an arbitration award is confined to 'the strictest possible limits[.]'" *Gadd v. Kelley,* 66 Haw. 431, 441, 667 P.2d 251, 258 (1983) (quoting *Mars Constructors, Inc. v.*

*Tropical Enters., Ltd.,* 51 Haw. 332, 336, 460 P.2d 317, 319 (1969)). Courts are authorized to vacate an arbitration award based only on the four grounds specified in HRS § 658–9, and to modify or correct an award only on the three grounds specified in HRS § 658–10. *Mars Constructors,* 51 Haw. at 336, 460 P.2d at 319. Sections 658–9 and 658–10 "also restrict the authority of [appellate courts] to review judgments entered by circuit courts confirming ... arbitration awards[.]" *Id.* at 336, 460 P.2d at 320. Moreover, the courts have "no business weighing the merits of ... the [arbitration] award." *Local Union 1260, Int'l Bhd. of Elec. Workers, AFL–CIO v. Hawaiian Tel. Co.,* 49 Haw. 53, 58, 411 P.2d 134, 137 (1966). Finally, "HRS § 658–8 contemplates a judicial confirmation of the award issued by the arbitrator, 'unless the award is vacated, modified, or corrected' in accord with HRS §§ 658–9 and 658–10." *Morrison–Knudsen Co. v. Makahuena Corp.,* 66 Haw. 663, 672, 675 P.2d 760, 767 (1983).

*Arbitration Bd. of Directors of Ass'n of Apartment Owners of Tropicana Manor,* 73 Haw. 201, 205–07, 830 P.2d 503, 506–07 (1992) (brackets in original) (some ellipsis points in original and some added) (footnotes omitted). *See also Excelsior Lodge Number One, Indep. Order of Odd Fellows v. Eyecor, Ltd.,* 74 Haw. 210, 224–27, 847 P.2d 652, 659–60 (1992).

■ Correlatively, and

[c]onsistent with the policy of limiting judicial review of arbitration awards in order to encourage arbitration and discourage litigation, we have held that parties who arbitrate a dispute assume "all the hazards of the arbitration process, including the risk that the arbitrators may make mistakes in the application of law and in their findings of fact." *Mars Constructors,* 51 Haw. at 335–36, 460 P.2d at 319; *accord Gadd v. Kelley,* 66 Haw. 431, 667 P.2d 251 (1983); *Salud v. Financial Sec. Ins. Co.,* 7 Haw.App. 329, 763 P.2d 9, *cert. denied,* 70 Haw. 664, 796 P.2d 501 (1988).

---

13. We note that the November 16, 1992 "judgments" were redundant of, and therefore surplusage with respect to, the October 28, 1992 confirmation and partial "modification" orders. *See supra* note 11.

An arbitration "award, if made in good faith, is conclusive upon the parties, and ... neither of them can be permitted to prove that the arbitrators decided wrong either as to the law or the facts of the case." *Thomas v. Trustees of Lunalilo Estate,* 5 Haw. 39, 40 (1883) (citations omitted).

*Jeffers,* 73 Haw. at 214–15, 830 P.2d at 511 (ellipsis points in original).

## III. *DISCUSSION*

A. *Pursuant To 28 U.S.C. § 1447(c), The Circuit Court Reacquired Jurisdiction Over Civil No. 89–2522 When The Federal District Court Clerk Mailed The Order Of Remand To The Clerk Of The Circuit Court.*

Aloha's first point of error on appeal is jurisdictional and advances the following argument: (1) the failure of the circuit court clerk to file the certified remand order in the court record prior to February 22, 1993 precluded the circuit court from reexercising subject matter jurisdiction over Civil No. 89–2522; (2) the filing of S.P. 92–0333—for the ostensible purpose of separately endeavoring to confirm the arbitration award—did not cure the "underlying defects"; and, therefore, (3) the circuit court was "required" to vacate the March 18, 1992 stipulation to arbitrate, as well as the October 1992 orders denying Aloha's motion to vacate the arbitration award and granting Mathewson's motions to confirm it, and to dismiss the consolidated actions.

Aloha's entire argument, of course, turns on the validity of its premise, namely, that the failure to file the certified remand order in the circuit court file until February 22, 1993 rendered the circuit court's reacquisition of Civil No. 89–2522 jurisdictionally defective prior to that date. As we will demonstrate below, Aloha's premise is specious.

### 1. *The federal statutory scheme*

■ The "procedure for removal" of a state court proceeding by a defendant therein to the federal district court for the district in which the proceeding is pending is delineated in 28 U.S.C. § 1446 (1988). 28 U.S.C.

§ 1446(a) provides in relevant part that "[a] defendant ... desiring to remove any civil action ... from a State court shall file in the district court of the United States for the district ... within which such action is pending a notice of removal ... containing a short and plain statement of the grounds for removal[.]" In addition, 28 U.S.C. § 1446(d) provides in relevant part:

> Promptly after the filing of [a] petition for the removal of a civil action ... the defendant ... shall give written notice thereof to all adverse parties and shall file a copy of the petition with the clerk of such State court, which shall effect the removal and the State court shall proceed no further unless and until the case is remanded.

Consequently, "[a]fter removal, a federal court acquires full and exclusive jurisdiction over the litigation." 14A C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure: Jurisdiction 2d § 3738, at 556 (1985) (footnote omitted). Moreover, the federal court is not divested of jurisdiction until the proper procedures for remanding the case have been followed. *See, e.g., Cook v. J.C. Penney Co.,* 558 F.Supp. 78, 79–80 (N.D.Iowa 1983).

The relevant federal statutory procedure for remanding an action—that has been removed to the federal court—back to the state court from which it originated is found in 28 U.S.C. § 1447(c) (1988), which provides in relevant part:

> A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.... *A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case.*

(Emphasis added.)

### 2. *Divestiture of federal jurisdiction and restoration of jurisdiction in the circuit court*

As noted above, Mathewson filed his remand motion on October 28, 1989—twenty-

nine days after Aloha initially removed Civil No. 89–2522 to the federal district court. Moreover, Aloha admits that (1) the federal district court entered its remand order on March 19, 1990, (2) the federal district court clerk mailed a certified copy of the remand order to the circuit court clerk on March 21, 1990, and (3) the circuit court clerk acknowledged receipt of the order on March 23, 1990. The question, therefore, is whether the provisions of 28 U.S.C. § 1447(c) were satisfied and the circuit court was jurisdictionally empowered to "proceed" with the case as of March 21, 1990.

### a. *Rules of statutory construction*

■■■ In construing the terms of 28 U.S.C. § 1447(c), we adhere to well-settled rules of statutory construction, beginning with the longstanding proposition that

> the fundamental starting point is the language of the statute itself. The interpretation of a statute is a question of law which this court reviews *de novo*. Moreover, where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning. When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*Castle*, 79 Hawai'i at 76–77, 898 P.2d at 588–89 (citations, internal quotation marks, brackets, and ellipsis points omitted). Finally,

> [d]eparture from the plain and unambiguous language of the statute cannot be justified without a clear showing that the legislature intended some other meaning would be given the language or that a literal interpretation would produce absurd or unjust results that are clearly inconsistent with the purposes and policies of the statute.

*Schmidt v. Board of Directors of Ass'n of Apartment Owners of The Marco Polo Apartments*, 73 Haw. 526, 532, 836 P.2d 479, 483 (1992) (citations, internal quotation marks, and some brackets omitted). *See also Sandy Beach Defense Fund v. City Council*, 70 Haw. 361, 369, 773 P.2d 250, 256 (1989) (" '[W]here there is no ambiguity in the language of a statute, and the literal application of the language would not produce an absurd or unjust result, clearly inconsistent with the purposes and policies of the statute, ... the statute must be given effect according to its plain and obvious meaning.' ") (Quoting *State v. Palama*, 62 Haw. 159, 161, 612 P.2d 1168, 1170 (1980).).

### b. *Divestiture of federal jurisdiction*

We recognize that there is a lack of unanimity of opinion among the various jurisdictions as to the precise event that divests a federal court of jurisdiction over the subject matter of an action that has been remanded pursuant to 28 U.S.C. § 1447(c) and, consequently, as to the precise act that restores subject matter jurisdiction to the state court in which the action originated. Our research indicates that virtually all of the federal courts construe 28 U.S.C. § 1447(c) to interpose the mailing of a certified copy of the remand order to the state court clerk as a precondition to the federal court being divested of jurisdiction. *See, e.g., Hunt v. Acromed Corp.*, 961 F.2d 1079, 1082 (3rd Cir.1992) ("[I]n view of 28 U.S.C. § 1447(c), ... the district court could not have had jurisdiction after ... its clerk sent a certified copy of the order of remand to the prothonotary." (Footnote omitted.)); [14] *Browning v. Navarro*, 743 F.2d 1069, 1078 ("The federal court is completely divested of jurisdiction once it mails a certified copy of the order to the clerk of the state court. *See* 28 U.S.C. § 1447(c)[.]" (Footnote and some citations omitted.)), *reh'g denied*, 747 F.2d 1465 (5th Cir.1984); *Hubbard v. Combustion Eng'g, Inc.*, 794 F.Supp. 221, 222 (E.D.Mich.1992) ("[C]ourts have recognized a narrow exception to the loss of jurisdiction upon remand rule, finding that a district court retains jurisdiction to reconsider a remand order where

---

**14.** "Prothonotary" is "[t]he title given (in *e.g.* Pennsylvania) to an officer who officiates as prin-

cipal clerk of some courts." *Black's Law Dictionary* 1224 (6th ed.1990).

a certified copy of the order has not yet been mailed to [the] clerk of the state court to which the case is to be remanded." (Citations omitted.)); *Cook*, 558 F.Supp. at 79 ("[T]he federal court is not completely divested of jurisdiction to reconsider or vacate the order of remand until the order . . . has been entered and a certified copy . . . has been mailed to the clerk of the state court." (Citations omitted.)); *Rosenberg v. GWV Travel, Inc.*, 480 F.Supp. 95, 97 n. 3 (S.D.N.Y.1979) ("Entry of an order of remand and mailing a certified copy to the State Court under 28 U.S.C. § 1447(c) completely divests the federal court of jurisdiction and *reinvests the State Court with jurisdiction to proceed.*" (Citation omitted and emphasis added.)). *See also* 14A C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure: Jurisdiction 2d § 3739, at 588–89 (1985) ("An order of remand ends the jurisdiction of the federal court. The court is required to mail a certified copy of the order to the clerk of the state court, and upon the state court's receipt of this copy, the federal court is without power to vacate the order to remand[.]" (Footnote omitted.)).

On the other hand, at least one federal district court has construed the language of 28 U.S.C. § 1447(c) much less strictly. In *Shoals T.V. & Appliance, Inc. v. Auto Owners Ins. Co.*, 791 F.Supp. 283 (N.D.Ala.1992), the court expressed the view that, pursuant to 28 U.S.C. § 1447(c), "[o]nce a district court certifies a remand order to state court it is divested of jurisdiction and can take no further action in the case." *Id.* at 287 (citing, *inter alia, Seedman v. United States Dist. Court*, 837 F.2d 413, 414 (9th Cir.1988)) (emphasis deleted). Significantly, however, the *Shoals* court interpreted the last sentence of

28 U.S.C. § 1447(c) as being "directed"— presumably as opposed to "mandatory," *see State v. Toyomura*, 80 Hawai'i 8, 19–20, 904 P.2d 893, 904–05 (1995) [15]—with respect to the *"ministerial act of the Clerk of this Court in mailing a certified copy of the Order of Remand to the Clerk of the [state] Circuit Court [.]" Shoals*, 791 F.Supp. at 287 (emphasis in original).

A number of state courts have agreed with the *Shoals* view and have construed the mailing provision of 28 U.S.C. § 1447(c) merely as a ministerial act of according notice and not as a substantive precondition to the restoration of subject matter jurisdiction in the state court. *See, e.g., Citizens Bank & Trust Co. v. Carr*, 583 So.2d 864, 866 (La.Ct.App.) ("[I]t was not error for the trial court to base its finding of reinstated jurisdiction on a true copy of the remand order provided by counsel instead of a remand order mailed by the federal court clerk. The action of a court entering an order of remand, and not the action of a clerk in mailing a copy of the order, determines the vesting of jurisdiction." (Citation omitted.)), *cert. denied*, 588 So.2d 109 (La.1991); *Brown v. State Farm Mut. Auto. Ins. Co.*, 449 S.W.2d 93, 96 (Tex.Civ. App.1969) ("[A]ppellant contends that the trial court erred in rendering the summary judgment on April 18, 1969, because at that time the case was still pending in the U.S. District Court and that the state court did not have jurisdiction of the case. . . . Although the U.S. District Court's remand order was signed on March 13, 1969, the transcript does not show that a certified copy of it has ever to this date been filed in the trial court. . . . A copy of such order, which is not certified to, was filed in the trial court on June 25, 1969, which is well after the date of

**15.** With regard to the term "shall," we have long subscribed to the view that

[t]he use of the word "shall" in [a] statute is not dispositive of the issue . . . whether the statute is mandatory rather than directory. While the word "shall" is generally regarded as mandatory, in certain situations it may properly be given a directory meaning. In determining whether a statute is mandatory or directory[,] the intention of the legislature must be ascertained. The legislative intent may be determined from a consideration of the entire act, its nature, its object, and the consequences that would result from con-

struing it one way or the other. In general, a statute is directory rather than mandatory if the provisions of the statute do not relate to the essence of the thing to be done or where no substantial rights depend on compliance with the particular provisions and no injury can result from ignoring them.

*Jack Endo Elec., Inc. v. Lear Siegler, Inc.*, 59 Haw. 612, 616–17, 585 P.2d 1265, 1269 (1978) (citations, internal quotation marks, and ellipsis points omitted).

*Toyomura*, 80 Hawai'i at 19–20, 904 P.2d at 904–05 (brackets and ellipsis points in original).

the summary judgment.... Appellant's ... point of error is hereby overruled.... [W]here a Federal Court to which a case has previously been removed from a state court remands the cause, its order of remand ipso facto terminates the jurisdiction of the Federal Court and ... jurisdiction is thereby restored to the state court." (Citations omitted.)). *See also Preston v. Allstate Ins. Co.,* 627 So.2d 1322, 1324 (Fla.Dist.Ct.App.1993) ("[T]he removal statute gives the state court a clear demarcation of when state court jurisdiction ceases, and when (if ever) the state court may resume jurisdiction.... [T]he state court is allowed to resume jurisdiction if, and only if, the federal court grants permission by entering an order of remand."); *Eastern v. Canty,* 75 Ill.2d 566, 27 Ill.Dec. 752, 755, 389 N.E.2d 1160, 1163 (1979) ("Had the [federal court's] order ... remanded the case, the [state] circuit court would thereby have reacquired jurisdiction." (Citations omitted.)); *Reimer v. Scott,* 666 S.W.2d 384, 385 (Tex.App.1984) ("The order of remand terminates the jurisdiction of the federal court and immediately restores the jurisdiction of the state court." (Citation omitted.)).

█ We need not choose between the two views set forth above, inasmuch as none of the cited cases (or, to our knowledge, any other) have held that the filing of a certified federal remand order in the official record of a previously removed state court proceeding is a necessary precondition to the federal court being divested of subject matter jurisdiction over the action. For present purposes, it is sufficient that the courts appear unanimously to agree that, in order to divest a federal court of jurisdiction over a state court matter that has been removed to it pursuant to 28 U.S.C. §§ 1446(a) and (d), no *more* is required than that the federal court clerk mail a certified remand order to the state court clerk in accordance with 28 U.S.C. § 1447(c).

█ Consistent with the foregoing, we hold that the plain and unambiguous language of 28 U.S.C. 1447(c)—which is clearly consistent with the purposes and policies underlying the federal statutory scheme governing the removal and remand of cases originating in the state courts and produces no manifestly absurd or unjust results—divested the federal district court of jurisdiction over Civil No. 89–2522, at the very latest, on March 21, 1990, when the federal district court clerk mailed a certified copy of the remand order to the circuit court clerk.

#### c. *Restoration of circuit court jurisdiction*

█ Our holding does not end our jurisdictional analysis, however, because Aloha urges that in *Norris v. Hawaiian Airlines, Inc.,* 74 Haw. 235, 842 P.2d 634 (1992), *aff'd,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994), this court "interpreted 28 U.S.C. § 1447(c) to require that a certified copy of the [o]rder of [r]emand be in the [circuit court] record prior to the [c]ircuit [c]ourt proceeding with the case after remand," thus imposing "a slight burden on a plaintiff that has successfully had a case remanded to the [c]ircuit [c]ourt[.]" In other words, Aloha contends that *Norris* stands for the proposition that, although the federal district court may have been divested of jurisdiction over Civil No. 89–2522 by virtue of the certified remand order having been mailed to the circuit court clerk, the circuit court nevertheless did not reacquire jurisdiction over the matter until February 22, 1993, when the certified remand order was actually filed in the official record. We disagree and take this opportunity to clarify the relevant language in *Norris.*

Ironically, Aloha's entire reliance on *Norris* rests on a footnote [hereinafter, "footnote 7"] that appears in the "facts" section of the decision. By way of background, the plaintiff (Norris) had commenced two wrongful termination actions in the circuit court, the first (Civil No. 87–3894) against Hawaiian Airlines (HAL) alone and the second (Civil No. 89–2904) against two of HAL's corporate officers and one of its managers. HAL had removed the first action to the federal district court, which subsequently remanded the case to the circuit court. In explaining why only the second action was before us on appeal, we stated, *inter alia,* the following in footnote 7:

Norris'[s] complaint against HAL, identified as Civil No. 87–3894, is not at issue on this appeal because the circuit court's or-

der and judgment entered in that case were vacated by this court due to lack of jurisdiction following removal from federal court. We stated:

> Upon review of the record it appears Civil No. 87–3894 ... was removed to federal court under 28 U.S.C. § 1446. It further appears that there is no certified order of remand in the record as required by 28 U.S.C. § 1447(c) for the state court to proceed with the case. Thus, the circuit court lacked jurisdiction and its orders and judgment in Civil No. 87–3894 must be vacated. *See, e.g.,* 14A Wright, Miller, & Cooper, *Federal Practice & Procedure* § 3737 (West, 1985).

*Norris,* 74 Haw. at 244 n. 7, 842 P.2d at 639 n. 7.

Aside from the fact that the footnote was obviously intended merely to explain the procedural posture of the appeal before us in *Norris* and was therefore not germane to the legal analysis of the points of error on appeal, our particular citation to Wright, Miller, & Cooper is instructive as to the significance of footnote 7. 14A C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure: Jurisdiction 2d § 3737, at 551, states in relevant part that, "[a]ccording to [28 U.S.C. § ] 1446(e), after the removal of a case is completed, 'the State court shall proceed no further *unless and until the case is remanded.*' Any further proceedings in the state court are coram non judice and will be vacated[.]" (Emphasis added and footnote omitted.) The only relevance of the quoted language is the self-evident proposition that removal of an action to a federal district court divests the state court of jurisdiction over the matter unless and until it is remanded. Conspicuously absent from footnote 7 was any reference to section 3739 of the treatise, quoted above, at 588–89, which states that "[a]n order of remand ends the jurisdiction of the federal court. The court is required to mail a certified copy of the order to the clerk of the state court, and *upon the state court's receipt of this copy, the federal court is without power to vacate the order to remand,* even if it is persuaded that the order was erroneous." *Id.,* § 3739 at 588–89 (emphasis

added and footnotes deleted). The clear import of section 3739 is that federal jurisdiction over a removed action comes to an irreversible end once the state court clerk has received the federal district court's certified remand order.

Thus, no more can be made of footnote 7 than that, on the record before it, the *Norris* court was unable to determine that Civil No. 87–3894 had, in fact, been remanded to the circuit court following its removal, and, barring such a determination, this court could not verify that the jurisdiction of the federal district court had come to an irreversible end and, therefore, that the circuit court had the power to reexercise jurisdiction. By contrast, and as we have noted, it is undisputed in the present case that the federal district court timely remanded Civil No. 89–2522 to the circuit court and that the circuit court clerk received a certified copy of the remand order. Accordingly, footnote 7 is of no assistance to Aloha in the present appeal.

To accept Aloha's construction of 28 U.S.C. § 1447(c) would lead to the absurd result that, despite the admitted fact that the federal district court had lost jurisdiction over Civil No. 89–2522 by virtue of its remand order, *no court* had jurisdiction to adjudicate the action because it literally remained in a state of limbo until February 22, 1993. Consistent with the rules of statutory construction cited *supra* in section III.A.2.a. of this opinion, we refuse to adopt such a view. Indeed, Aloha's position appears to be utterly without authoritative support and has, by clear implication, been universally rejected. *See Rosenberg,* 480 F.Supp. at 97 n. 3; *Preston,* 627 So.2d at 1324; *Carr,* 583 So.2d at 866; *Reimer,* 666 S.W.2d at 385; *Eastern,* 27 Ill.Dec. at 755, 389 N.E.2d at 1163; *Brown,* 449 S.W.2d at 96.

We hold, pursuant to the plain and unambiguous language of 28 U.S.C. § 28 § 1447(c), that the circuit court reacquired subject matter jurisdiction over Civil No. 89–2522 on March 21, 1990, when the federal district court clerk mailed the certified remand order to the clerk of the circuit court. Accordingly, the circuit court did not lack judicial power to approve the parties' stipulation to arbitrate and to confirm the arbitra-

tion award in favor of Mathewson and against Aloha.

B. *The Arbitrator Did Not "Decide" Mathewson's Claim Of Breach Of Implied Contract, As Alleged In The Portion Of Count III Of The Complaint That Was Previously Dismissed By The Circuit Court, And Therefore Did Not Exceed His Powers In Violation Of HRS § 658–9(4).*

██ Noting that "this [c]ourt has not hesitated to vacate arbitration awards where the arbitrator has clearly exceeded his authority ... or has otherwise acted in derogation of the four criteria set forth in HRS § 658–9," *see supra* note 1, Aloha submits as its second point of error on appeal that "the [a]rbitrator exceeded his powers when he decided in Mathewson's favor on Mathewson's claim for breach of an implied contract, the exact claim which had been dismissed by [the circuit court] when [it] dismissed Count III of the [c]omplaint, and Counts IV and V to the extent that they related to or were parasitic of the claims under Count III." Thus, Aloha urges that the circuit court erred in granting Mathewson's motion to confirm Tsukiyama's Final Decision and denying Aloha's motion to vacate it. However, because Tsukiyama did not "decide" any dismissed portion of Count III of Mathewson's complaint, Aloha's second point of error is without merit.

██ We acknowledge three related principles at the outset. First, ("[a]lthough ... [Hawai'i's] public policy as reflected by ... HRS [ch.] 658[ ] strongly favors arbitration over litigation, the mere existence of an arbitration agreement does not mean that the parties must submit to an arbitrator disputes which are outside the scope of the arbitration agreement." *Norris,* 74 Haw. at 259, 842 P.2d at 645). *See also AT & T Technologies v. Communications Workers of Am.,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) ("Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (Citation and internal quotation marks omitted.)). Second, precisely because "[t]he

scope of an arbitrator's authority is determined by agreement of the parties," it follows that "[a]n arbitrator must act within the scope of the authority conferred upon him by the parties and cannot exceed his power by deciding matters not submitted." *Clawson v. Habilitat, Inc.,* 71 Haw. 76, 78, 783 P.2d 1230, 1231 (1989) (citations omitted). Accordingly, third, where an arbitrator has exceeded his or her powers by deciding matters not submitted, this court has held, pursuant to HRS § 658–9(4), that the resulting arbitration award must be vacated. *Brennan v. Stewarts' Pharmacies, Ltd.,* 59 Haw. 207, 223, 579 P.2d 673, 681–82 (1978).

It is apparent, however, that none of the foregoing principles have been violated in the present case. As indicated *supra* in section I.A. of this opinion, the circuit court's July 12, 1990 order *granted* Aloha's motion to dismiss Mathewson's complaint in Civil No. 89–2522 only as to: (1) such of Count III (Breach of Contract) as did *not* relate to or was *not* "parasitic" of the claims asserted in Counts I (Discharge in Violation of Public Policy) and II (Promissory Estoppel); and (2) such of Counts IV (Negligent and/or Intentional Misrepresentation and/or Fraud) and V (Intentional and/or Negligent Infliction of Emotional Distress) as *did* relate to or *were* "parasitic" of the claims asserted in Count III. The order expressly *denied* Aloha's motion as to: (1) Count I in its entirety; (2) Count II in its entirety; (3) such of Counts III and V as *did* relate to or *were* "parasitic" of the claims asserted in Counts I and II; and (4) such of Count IV as did *not* relate to or was *not* "parasitic" of the claims asserted in Count III. Thus, by the express terms of the July 12, 1990 order, Counts I and II, as well as those aspects of Counts III, IV, and V that were ancillary to Counts I and II, survived Aloha's motion to dismiss and remained viable as of March 18, 1992.

Also as indicated *supra* in section I.A. of this opinion, the parties' court-approved March 18, 1992 stipulation expressly submitted to arbitration "all claims ... which were raised or which could properly have been raised" in Civil No. 89–2522. Accordingly, by its express terms, the stipulation placed (1) Counts I and II in their entirety and (2)

those aspects of Counts III, IV, and V that were ancillary to Counts I and II squarely before Tsukiyama for arbitration.

In his Preliminary Decision, Tsukiyama enumerated Counts I, II, IV, and V of Mathewson's complaint as containing the "issues submitted for determination." Having heard and considered the evidence presented, Tsukiyama found in favor of Mathewson and against Aloha on "the issue of liability" based upon "one or more of the four [enumerated] counts of the [c]omplaint." Specifically, Tsukiyama, determined that the evidence clearly supported a finding of liability against Aloha with respect to Counts I and V and "probably" with respect to Counts II and IV. It is significant that *nowhere* in his Preliminary Decision did Tsukiyama make an express finding that Aloha was *liable* to Mathewson based upon any claim alleged in Count III of the complaint.

The object of Aloha's angst appears in section 8 of the Preliminary Decision, in which Tsukiyama set forth his analysis of Mathewson's claim that he was terminated in violation of public policy, as alleged in Count I of the complaint. The operative finding in section 8 [hereinafter, "the section 8 finding"] was the following:

> It is found that [Aloha's] discharge of [Mathewson] was in contravention of a clear public policy against "blacklisting" and discrimination in the hiring, tenure[,] or other conditions of employment with regard to nonmembership in a labor organization or the right to refrain from labor activities, as proscribed by both State and Federal labor law and policy. The "public policy" exception to at-will terminations enunciated by the *Parnar* rule[ [16] ] is found applicable and is hereby adopted.
>
> . . . .
>
> . . . It is found that [Mathewson] has filed an actionable cause of action in tort alleging and establishing that he was discharged in violation of a clear mandate of public policy.

Section 8 described the "clear mandate of public policy" that Aloha had violated in the following manner:

> *The acceptance and adoption* by [Aloha] *of bias-tainted evaluations* made by its pilot evaluators[,] in furtherance and effectuation of their "blacklisting" effort to remove [Mathewson] from [Aloha's] employment[,] *and the decision to actually discharge him based on such tainted evaluations constituted an act* of respecting, supporting, abetting[,] and enforcement of a "blacklist", *in contravention of clear public policy* encompassed in HRS [§ ] 377–6[ [17] ] and Section 8 of the National Labor Relations Act. . . . *By its discharge action based upon pretextual pilot ratings, [Aloha] acted discriminatorily against [Mathewson]* [—] knowing [that] he was the target of concerted "blacklist" objectives of the pilots and their union *[—and] therefore in contravention of recognized public policy* disfavoring the same.

(Emphases added.)

Inasmuch as the section 8 finding was the product of Tsukiyama's good faith application of the law to his factual findings, Aloha cannot and does not challenge it. *See Jeffers*, 73 Haw. at 214–15, 830 P.2d at 511; *Gadd*, 66 Haw. at 443, 667 P.2d at 259; *Mars Constructors*, 51 Haw. at 335–36, 460 P.2d at 319; *Thomas*, 5 Haw. at 40. Rather, Aloha bases its second point of error on appeal on the concluding language of section 8:

> In a related claim [*i.e.*, Count III], [Mathewson] has alleged [that] his discharge was in violation of a specific Company Flight Operations Manual provision. . . . Here, the "implied contract" exception to the at-will doctrine appears to apply. . . . *[Mathewson's] discharge, based upon bias-tainted, pretextual evaluations[,]* which did not address his "individual merits and qualifications" in a fair, objective manner, *ran counter to the intent and purpose of . . . the Manual.*

(Emphases added.)

The crux of Aloha's second point of error— *i.e.*, that Tsukiyama exceeded his arbitral

---

16. *See supra* note 9.

17. *See supra* note 10.

powers by deciding a claim that was not before him by virtue of having been previously dismissed by the circuit court—is misguided for at least three reasons. First, as demonstrated above, the circuit court expressly denied Aloha's motion to dismiss Count III, *inter alia*, insofar as it related to or was "parasitic" of the claim asserted in Count I, and, by virtue of the parties' court-approved stipulation, Count III was therefore submitted to Tsukiyama for arbitration to that extent. Second, Tsukiyama did not "decide" Mathewson's surviving Count III claim, inasmuch as Tsukiyama's finding of liability on Aloha's part was expressly grounded in Mathewson's Count I and V claims and "probably" in his Count II and IV claims. And, third, by its very terms, as well as its placement within his Count I analysis, Tsukiyama's reference to Count III was manifestly limited to—and thus "related to" and "parasitic of"—his finding that Mathewson's discharge violated federal and state public policy.

We hold that Tsukiyama did not violate HRS § 658–9(4) by deciding an issue that had not been submitted to him. Accordingly, we further hold that the circuit court's denial of Aloha's motion to vacate the arbitration award in Mathewson's favor was not error insofar as Aloha's motion was premised on the claim set forth in its second point of error.

C. *Because, Having Allowed The Parties To Adduce Evidence Relating To Mathewson's Competence As A Pilot—Including Mathewson's Experience With And Flying Record At Two Air Carriers Prior And Subsequent To His Employment With Aloha—, The Arbitrator Deemed The Evidence To Be Irrelevant To Aloha's Actual Reason For Discharging Mathewson, Which Was Wholly Unrelated To The Policy Of Protecting The Safety Of The Flying Public, The Arbitrator Neither Refused To Hear Evidence Pertinent And Material To The Controversy As Required By HRS § 658–9(3) Nor To Decide A Question Submitted To Him As Required By HRS § 658–9(4).*

Aloha's third point of error on appeal is that the circuit court erred in confirming, rather than denying, the arbitration award because: (1) Tsukiyama "excluded all evidence submitted by Aloha concerning Mathewson's experience and record at [another air carrier prior to his employment with Aloha] and introduced by Mathewson concerning his flying record at [another air carrier subsequent to his employment with Aloha] and other positive testimonies of his good and satisfactory flying abilities and record elsewhere" (internal quotation marks omitted), thereby refusing "to hear evidence pertinent and material to the controversy in violation of HRS § 658–9(3)," *see supra* note 1, and; (2) the issue of Mathewson's competence as a pilot being material to "the public policy of protecting the safety of the flying public," Tsukiyama's refusal to decide the issue violated HRS § 658–9(4). *See id.*

By its express terms, HRS § 658–9(3) authorizes the circuit court to vacate an arbitration award, *inter alia*, where the arbitrator is "guilty of misconduct ... in refusing to hear evidence, pertinent and material to the controversy[.]" Moreover, pursuant HRS § 658–9(4), we have held that arbitrators exceed their powers and their awards must therefore be vacated where they fail to decide the question that has been submitted to them. *Brennan*, 59 Haw. at 222–23, 579 P.2d at 681–82. However, because Tsukiyama found as a fact that Aloha terminated Mathewson for reasons wholly extraneous to his competence as a pilot and the necessity of insuring the safety of its passengers, and because Tsukiyama therefore correctly ruled that the evidence in question was irrelevant to the controversy, Aloha cannot benefit from these principles; thus, its third point of error is likewise without merit.

It is of particular significance to this phase of our analysis that Aloha has admitted that it discharged Mathewson "for the sole reason that his [peer-pilot] evaluations were not satisfactory" and, therefore, that Aloha's foundational basis for its termination decision is deemed to have been conclusively proved. *See supra* note 7. It is also significant that, based on the "massive evidence" that he permitted the parties to place before him,

Tsukiyama found as facts that: (1) Mathewson's evaluators—as well as the entire evaluation process as applied to Mathewson—were "contaminated with discriminatory motivation and bias" against Mathewson; (2) Mathewson's negative evaluations, being "fatally contaminated with 'anti-scab' bias" that rendered their contents "an obvious pretextual cover to rid [Aloha] of a despised 'scab,'" were effected without regard to—or any concern for—Mathewson's actual competence as a pilot or his prior performance record; (3) Aloha was fully aware of the unreliable and pretextual character of Mathewson's peer-pilot evaluations; and (4) Aloha—knowing that it lacked any justifiable basis either for impugning Mathewson's competence as a pilot or for believing that Mathewson's continued employment would jeopardize passenger safety, and desiring to avoid the "pilot unrest," "cold cockpits," and impaired relations with ALPA that it believed would result from Mathewson's retention—deliberately used the negative evaluations as cover for its termination decision. *See* section I.B. of this opinion, *supra.* Finally, it is significant that Aloha does not claim that the arbitration award was "procured by corruption, fraud, or undue means," *see* HRS § 658–9(1), *supra* at note 1, or that Tsukiyama exhibited any "evident partiality or corruption," *see* HRS § 658–9(2), *supra* at *id.* In light of the foregoing, Tsukiyama's good faith factual findings are conclusive upon the parties, and Aloha may not seek to establish that Tsukiyama decided them wrongly. *Jeffers,* 73 Haw. at 214–15, 830 P.2d at 511; *see also Gadd,* 66 Haw. at 443, 667 P.2d at 259; *Mars Constructors,* 51 Haw. at 335–36, 460 P.2d at 319; *Thomas,* 5 Haw. at 40.

Given Tsukiyama's unreviewable factual findings, the question becomes whether evidence bearing upon Mathewson's competence as a pilot, including his performance record prior and subsequent to his discharge from Aloha, was pertinent and material to the controversy that the parties stipulated for arbitral resolution. In this connection, Tsukiyama correctly ruled that "the prime and sole focus of [the] arbitration center[ed] around the propriety of [Mathewson's] termination[.]" That being the case, and because Tsukiyama expressly found that Mathewson's experience, performance record, and competence as a pilot were neither "considered nor constituted factors in [Aloha's] decision to terminate," we hold as a matter of law that the evidence in question had no "tendency to make the existence of any fact that [was] of consequence to the determination of the action more probable or less probable than it would be without the evidence" and that it was therefore irrelevant. *See* Hawai'i Rules of Evidence (HRE) Rule 401, *supra* at note 6. Because it was irrelevant, the evidence was inadmissible. *See* HRE 402, *supra* at *id.*

Accordingly, we hold that Tsukiyama did not violate HRS §§ 658–9(3) or 658–9(4) because he did not refuse to hear evidence pertinent and material to the controversy that had been submitted to him. It therefore follows, and we so hold, that the circuit court's denial of Aloha's motion to vacate the arbitration award in Mathewson's favor was not error insofar as Aloha's motion was premised on the claim set forth in its third point of error.[18]

18. Our holdings render inapposite Aloha's reliance on *Hoteles Condado Beach v. Union de Tronquistas de Puerto Rico,* 588 F.Supp. 679 (D.P.R. 1984), *aff'd,* 763 F.2d 34 (1st Cir.1985), and *Harvey Aluminum (Inc.) v. United Steelworkers of Am., AFL–CIO,* 263 F.Supp. 488 (C.D.Cal.1967). In each of those cases, the arbitrator improperly excluded evidence that, as a matter of law, was pertinent and material (*i.e.,* relevant) to the subject matter of the submitted controversy.

Equally misplaced is the federal authority that Aloha cites for the proposition that enforcement of the arbitration award would violate the strong policy of ensuring the safety of the public with respect to air travel and that the award should therefore be vacated. *See Inlandboatmen's Union of the Pac., Hawai'i Region, Marine Div. of*

*Int'l Longshoremen's and Warehousemen's Union v. Sause Bros., Inc.,* 77 Hawai'i 187, 193–95, 881 P.2d 1255, 1261–63 (App.1994) (recognizing test established in *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), for application of public policy exception to enforcement of arbitration awards). We do not question the existence of the public policy. *See Norris,* 74 Haw. at 260, 842 P.2d at 646; *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l,* 861 F.2d 665 (11th Cir.1988), *reh'g denied,* 867 F.2d 1431 (11th Cir.1989), *cert. denied,* 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989); *World Airways, Inc. v. International Bhd. of Teamsters, Airline Div.,* 578 F.2d 800 (9th Cir.1978). However, the arbitration award in the present case did not undermine the public

D. *The Circuit Court's Orders Confirming And "Modifying" The Arbitration Award Comported With HRS Ch. 658 And Therefore Did Not Constitute Error.*

 Citing *Excelsior Lodge Number One* and *Jeffers, supra,* in support of its fourth and final point of error on appeal, Aloha contends that, because "Mathewson never

filed a motion under HRS § 658–10[,[19]] which was noticed and served in the manner prescribed by HRS § 658–11,"[20] the circuit court "lacked the authority to modify the [a]ward[,] and[,] *if* it found that the [a]rbitrator had exceeded his powers in awarding non-economic relief, then its only recourse was to vacate the [a]ward pursuant to HRS § 658–9[,[21]] which was [Aloha's] motion before the [c]ourt." (Emphasis added.)[22]

policy or even implicate it. The award in no way compromised Aloha's capacity to determine and regulate the competence of its pilots. Mathewson was discharged for reasons unrelated to his competence or for any other reason supported by public policy. And, although the arbitration award set aside Mathewson's discharge, it did not order him reinstated as a line pilot. Accordingly, the award, in and of itself, in no way obligated Aloha to return Mathewson to his former position. In any event, to the extent that a portion of the arbitration award clearly violated an explicit, well defined, and dominant public policy expressly reflected by statute, regulation having the force of law, or legal precedent, the offending portion of the award would be unenforceable. *Sause Bros.,* 77 Hawai'i at 193–94, 881 P.2d at 1261–62; *Misco,* 484 U.S. at 42, 108 S.Ct. at 373. Such a state of affairs would not, however, require that the entire arbitration award be vacated. *See* section III.D. of this opinion, *infra.*

19. *See supra* note 3.

20. *See supra* note 4.

21. *See supra* note 1.

22. To be exact, Aloha's fourth point of error, as set forth in the "statement of points relied upon" section of its opening brief, pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (1995), alleged that:

 4. The [circuit] [c]ourt erred in modifying the [a]rbitrator's [a]ward pursuant to HRS § 658–10[,] where no motion to modify had been filed under HRS § 658–10 within 10 days after service of the [a]rbitration [a]ward as required by HRS § 658–11, and the only [m]otions before the [c]ourt were to [v]acate the [a]ward pursuant to HRS § 658–9 or [c]onfirm it pursuant to HRS § 658–8.

Aloha's opening brief articulated the corresponding "question presented for decision," pursuant to HRAP 28(b)(6) (1995), as "[w]hether the [c]ircuit [c]ourt erred in modifying the [a]rbitration [a]ward pursuant to HRS § 658–10 where no motion to modify the award pursuant to HRS § 658–10 had been timely filed."

 Although Aloha raised it in the circuit court and alludes to it cursorily in its opening brief, the question whether the parties' court-approved stipulation to arbitrate authorized Tsukiyama to

award Mathewson "non-economic" relief is not before us; accordingly, pursuant to HRAP 28(b)(4) ("Points not presented in accordance with this section will be disregarded, except that the court, at its option, may notice a plain error not presented.") and 28(b)(6) ("Questions not presented in accordance with this paragraph will be disregarded, except that the court, at its option, may notice a plain error not presented."), we do not decide the question. *See Bettencourt v. Bettencourt,* 80 Hawai'i 225, 228, 909 P.2d 553, 558 (1995) (reaffirming prior holding that nonconformity with HRAP 28(b) "is, alone, sufficient basis to affirm the judgment of the circuit court"); *O'Connor v. Diocese of Honolulu,* 77 Hawai'i 383, 385, 885 P.2d 361, 363 ("[F]ailure to comply with HRAP 28(b)(4) is alone sufficient to affirm the judgment of the circuit court."), *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994). Nevertheless, we note that: (1) in their court-approved stipulation, Mathewson and Aloha agreed to arbitrate "all claims ... which were raised or which could properly have been raised in this matter[, *i.e.,* Civil No. 89–2522]" and further agreed that the arbitration was "meant to replace a trial by jury on all issues"; (2) it is well established that, in a jury trial of an action seeking equitable and legal remedies, the jury decides legal questions and awards legal damages and the court decides equitable questions and awards equitable relief; in other words, the election of a jury trial does not preclude access to equitable relief from the court. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479, 82 S.Ct. 894, 900–01, 8 L.Ed.2d 44 (1962) (recognizing prerogative of jury to decide legal claims and of court to decide equitable claims); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 508, 79 S.Ct. 948, 955, 3 L.Ed.2d 988 (1959) (recognizing that, after jury verdict, trial court could grant injunctive relief); and (3) "arbitrators do have the power to fashion equitable relief," *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 32, 111 S.Ct. 1647, 1655, 114 L.Ed.2d 26 (1991), and "may grant whatever remedy is necessary to right the wrongs within their jurisdiction." *Gilmer v. Interstate/Johnson Lane Corp.,* 895 F.2d 195, 199 (4th Cir.1990); *see also Dickler v. Shearson Lehman Hutton, Inc.,* 408 Pa.Super. 286, 596 A.2d 860, 864 (1991) ("[P]recedent ... establishes conclusively the appropriateness of the arbitral forum for deciding issues of equity.").

By contrast, Mathewson: (1) stresses that "the modification was minor"; (2) observes that "Aloha was the party who attacked the arbitration award, ... sought ... language that allowed it to comply with the award without violating an unspecified legal requirement ... [, and] got the relief it sought"; (3) suggests that Aloha "cannot now claim that the [circuit] [c]ourt's act of modifying the award, which [was] exactly what Aloha wanted, was an error upon which this [c]ourt could overturn the [c]ircuit [c]ourt's decisions"; and (4) urges that, in *Excelsior Lodge Number One*, this court "held that an attack on the face of an arbitration award through a motion to vacate, pursuant to HRS § 658–9, or a motion to modify or correct, pursuant to HRS § 658–10[,] allows the [circuit] court to either confirm, vacate, modify[,] or correct the award."

In our view, the arguments of both parties, to some extent, miss the forest for the trees. In any event, and for the reasons set forth below, we hold that the circuit court's October 28, 1992 orders confirming and "modify-ing" Tsukiyama's arbitration award complied with the provisions of HRS §§ 658–8, 658–9, 658–10, and 658–11.

As indicated *supra* in section I.C. of this opinion, on August 11, 1992, the circuit court had before it two timely motions—Mathewson's motion to confirm Tsukiyama's arbitration award, brought pursuant to HRS § 658–8, *see supra* note 2, and Aloha's motion to vacate it, brought pursuant to HRS §§ 658–9 and 658–11, *see supra* notes 1 and 4. The transcript of the August 11, 1992 hearing reflects that the portion of the circuit court's confirmation orders that purported to "modify" the arbitration award was responsive to the representation of Aloha's counsel that part of the award was fatally flawed insofar as it required that "Aloha destroy personnel files which could clearly violate federal and state requirements."[23] The transcript further reflects that, in response to the inquiry of Aloha's counsel regarding whether it was "making a finding" that the award "would violate state and federal law," the circuit

---

23. Specifically, Aloha objected to the portion of the arbitration award that directed Aloha to destroy or expunge its May 11, 1989 letter terminating Mathewson and all personnel records relating to Mathewson's discharge from its personnel files. Aloha never expressly alleged that the relief accorded Mathewson in the award entailed a violation of a federal or state regulatory scheme in its written motion to vacate, nor is the issue before this court on appeal. However, in its oral argument before the circuit court and this court, as well as in its opening brief on appeal, Aloha represented that the portion of the arbitration award ordering alteration or destruction of personnel records might violate state or federal law or regulation. In support of its collateral argument, Aloha cited 29 C.F.R. § 1602.1 *et seq.* and section 12–46–21 of the Hawai'i Administrative Rules (HAR) in its opening brief.

We take judicial notice of the fact that the only relevant provisions of either 29 C.F.R. § 1602.1 *et seq.* or HAR § 12–46–21 pertain to requirements that any personnel records which are maintained by an employer be retained for one year following their creation or for one year following an employee's involuntary termination. In particular, 29 C.F.R. § 1602.14, entitled "Preservation of records made or kept," provides in relevant part:

Any personnel or employment record made or kept by an employer (including ... records having to do with ... termination ... ) shall be preserved by the employer for a period of one year from the date of the making of the record

or the personnel action involved, whichever occurs later. In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination.

HAR § 12–46–21, entitled "Record keeping requirements," substantially tracks 29 C.F.R. § 1602.14 and provides in relevant part:

(a) Any personnel or employment record made or kept by an employer ... shall be preserved by the employer for one year from the date of the making of the record or the personnel action involved, whichever occurs later. The records shall include ... forms, applications, and records having to do with:
(1) Hiring;
(2) Promotion;
(3) Demotion; [or]
(4) Layoff or termination[.]
(b) In the case of involuntary termination of an employee, the personnel records of the individual terminated shall be kept for a period of one year from the date of termination.

Aloha attempted to terminate Mathewson effective May 15, 1989, after which time Mathewson performed no further services on Aloha's behalf. Tsukiyama's July 16, 1992 Final Decision nullifying and setting aside the discharge was confirmed by the circuit court's October 28, 1992 orders. The confirmation order is being affirmed on appeal. Thus, it is by no means clear that the regulations cited by Aloha are in conflict with the arbitration award.

court expressly indicated that it was "not making any comment[] whatsoever"—*i.e.,* was expressing no view—as to whether the award ordered any violation of law, inasmuch as it was unfamiliar with the substance of the "regulatory scheme" to which counsel for Aloha had alluded. Accordingly, it is apparent that the partial "modification" contained in the circuit court's October 28, 1992 confirmation orders was purely precautionary and did not constitute a finding that Tsukiyama had exceeded his arbitral powers within the meaning of HRS § 658–9(4).

Despite the parties' citations to them, the procedural postures of *Excelsior Lodge* and *Jeffers* were each quite different from that of the matter currently pending before us. In *Jeffers,* the prevailing party to an arbitration proceeding sought and received a "clarification" of the original award already entered by the arbitrator, who then entered a new amended award in the prevailing party's favor. *Jeffers,* 73 Haw. at 204–05, 830 P.2d at 506. The prevailing party subsequently filed a petition in the circuit to confirm the amended award, and the losing party moved to confirm the original award and vacate the amended award. *Id.* at 205, 830 P.2d at 506. The circuit court ultimately entered an order granting the prevailing party's motion. *Id.* The losing party appealed the circuit court's order to this court. On appeal, we held, *inter alia,* that (1) the arbitrator had exceeded his power *by reopening the arbitration* after issuing his original award, which was not ambiguous in such a manner as to require clarification, and (2) *the prevailing party,* by seeking a "clarification" of the unambiguous original award rather than moving to vacate, modify, or correct it, had waived its right to any judicial review of the original award. *Id.* at 208–10, 830 P.2d at 508–09. Accordingly, this court remanded the matter to the circuit court for the entry of an order vacating the amended award and *confirming the original award. Id.* at 215, 830 P.2d at 511.

In *Excelsior Lodge Number One,* the prevailing party to an arbitration proceeding moved the circuit court to confirm the arbitrators' award, and the circuit court granted the motion. *Excelsior Lodge Number One,*

74 Haw. at 212, 847 P.2d at 654. In the meantime, *the losing party had moved the circuit court neither to vacate nor to modify or correct the award.* The losing party thereafter appealed the circuit court's confirmation of the arbitration award, *claiming that the award was premised upon a mistaken application of statutory law by the arbitrators. Id.* The Intermediate Court of Appeals (ICA), to which the appeal was assigned, vacated the circuit court's confirmation order and remanded for a determination as to whether the arbitrators had in fact misapplied the statute. *Id.* at 213, 847 P.2d at 654. We granted the prevailing party's application for a writ of certiorari, reversed the decision of the ICA, and affirmed the circuit court's confirmation of the arbitration award on the basis, *inter alia,* that *the losing party* had failed timely to move to vacate the award pursuant to HRS § 658–9 or to modify or correct it pursuant to HRS § 658–10. *Id.*

Notwithstanding the distinguishable facts of the case, the following analysis set forth in *Excelsior Lodge Number One* is particularly germane to the present appeal:

The ICA, relying on this court's decision in *Gozum v. American Int'l Adjustment Co., Inc.,* 72 Haw. 41, 805 P.2d 445 (1991), ruled that

[a] party who disagrees with an arbitration award on the ground that the arbitrators have exceeded their powers has two opportunities to challenge it. First, the party may file an HRS § 658–9 application to vacate the award and serve it as required by HRS § 658–11. Second, the party may wait until the other party applies pursuant to HRS § 658–8 to confirm the award and then challenge the confirmation motion pursuant to HRS §§ [sic] 658–9.

*Excelsior Lodge [Number One, Indep. Order of Odd Fellows v. Eyecor, Ltd.],* [9 Haw.App. 354, 365], 847 P.2d [667,] 672 [ (1992) ].

The ICA's reliance on *Gozum* is misplaced. We acknowledge that one comment in dictum might suggest that a trial court could vacate, modify, or correct an award at a § 658–8 confirmation hearing.

However, the specific holding in *Gozum* was that *a party would not be barred from asking for a clarification of an arbitrator's award at a § 658–8 confirmation hearing, even though that party had failed to bring a timely motion under either HRS §§ 658–9 or 658–10. Gozum,* 72 Haw. at 45–46, 805 P.2d at 447. Moreover, we pointed out that the notice provision of HRS § 658–11 applied when a party wished to change the substance or the amount of an award, but not when a party merely asked for clarification of an ambiguous award. *Id.* at 46, 805 P.2d at 447.

In ... *Jeffers* ..., this court, citing *Gozum*, again ruled that a request for clarification of an arbitration award, which did not seek to change the substance or amount of that award, could avoid the ten-day service requirement of HRS § 658–11. In *Jeffers*, the parties on one side of an arbitration dispute who had not moved to vacate, modify, of correct an award sought to re-open the arbitration process for what they termed a "clarification." *Id.* at 212, 830 P.2d at 510. However, this court concluded that the parties were actually seeking a modification or correction of the award "in the guise of a clarification." *Id.* at 212–14, 830 P.2d at 510–11.

We reiterated in *Jeffers* that *in order to change an award under HRS chapter 658, a party must timely move either to vacate the award under HRS § 658–9 or to modify or correct it under HRS § 658–10. Id.* at 213, 830 P.2d at 510. We also noted that "[in] *Gozum*, we distinguished an arbitrator's clarification of an ambiguous award from a court's vacation, modification, or correction of an award." *Id.* We specifically stated in *Jeffers* that "[i]mplicit in our decision in *Gozum* to allow the arbitrator's clarification was the understanding that the total amount the insureds could recover would remain [the same amount] which appeared on the face of the award. Clearly, the clarification would not have changed the amount of the award." *Id.* at 214, 830 P.2d at 511....

In this case, [the losing party] is seeking a substantial change in the arbitration award.... It is obvious that [the losing party] is seeking more than a mere "clarifi-

cation," as that term is used in *Gozum* and *Jeffers*, but rather a substantive change of the award.

Thus, ... *because [the losing party] failed to timely bring either a § 658–9 motion to vacate or a § 658–10 motion to modify or correct the award and because it is seeking more that a mere clarification, [the losing party] is precluded from challenging the trial court's confirmation order.*

*Excelsior Lodge Number One,* 74 Haw. at 221–23, 847 P.2d at 657–58 (some brackets in original and some added) (some emphasis in original, some added, and some omitted).

■ The foregoing language of *Excelsior Lodge Number One* yields the following principles [hereinafter, "the *Excelsior* principles"]—to which we continue to adhere and which we expressly reaffirm: for purposes of appellate review (either at the circuit or appellate court level) of proceedings controlled by HRS ch. 658, (1) there is a difference between "clarification" of an arbitration award, on the one hand, and vacation, modification, or correction of the award, on the other; (2) "clarification" of an arbitration award does *not* seek to change the substance or amount of the award; (3) vacation, modification, and correction of an award, within the meaning of HRS §§ 658–9 and 658–10, *changes* the substance or amount of the award; (4) a party to an arbitration is not barred from seeking a clarification of an arbitration award at a confirmation hearing, conducted pursuant to HRS § 658–8, whether or not the party has moved to vacate, modify, or correct the award pursuant to HRS §§ 658–9 or 658–10; and (5) a party seeking to *change* the substance or amount of an arbitration award must timely move *either* to vacate the award under HRS § 658–9 *or* to modify or correct it under HRS § 658–10. Moreover, we add a sixth principle, which is really a corollary of the fifth: inasmuch as HRS § 658–9(4) empowers the circuit to grant a motion to vacate an arbitration award where the arbitrator has exceeded his or her powers by deciding matters not submitted, *Brennan,* 59 Haw. at 223, 579 P.2d at 681–82, and HRS § 658–10(2) authorizes the circuit court to modify or cor-

rect an award "[w]here the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted," it therefore follows that when a party has moved, pursuant to HRS § 658-9(4), to vacate an arbitration award on the ground that the arbitrator has decided a matter not submitted, the circuit court is empowered to modify or correct the award pursuant to HRS § 658-10(2).

Based upon the *Excelsior* principles, several options were potentially available, as appropriate, to the circuit court as a result of the August 11, 1992 hearing on Mathewson's motion to confirm and Aloha's motion to vacate Tsukiyama's arbitration award. First, the circuit court could have confirmed the award in its totality. Second, the circuit court could have confirmed the award subject to a clarification sought by either party. Third, the circuit court could have modified the award pursuant to the request for a substantive change implicit in Aloha's motion to vacate. And, fourth, the circuit court could have vacated the award. Obviously, the circuit court chose either the second or third option.

Despite the fact that the circuit court's October 28, 1992 orders purported to "modify" the "non-economic remedies" awarded in Tsukiyama's Final Decision "to the limited extent that compliance with said non-economic remedies would cause [Aloha] to violate any State or Federal statutes, laws, or regulations," *see supra* section I.C. of this opinion, a cogent argument could be made that the "modification" was nothing more than a "clarification," as envisioned in *Gozum, Jeffers,* and *Excelsior Lodge Number One,* insofar as it effected no substantive change in the award. In *Inlandboatmen's Union of the Pac., Hawai'i Region, Marine Div. of Int'l Longshoremen's and Warehousemen's Union v. Sause Bros., Inc.,* 77 Hawai'i 187, 194–95, 881 P.2d 1255, 1262–63 (App.1994), the ICA correctly applied "the general common law doctrine that a court may refuse to enforce contracts that violate law or public policy" to the enforcement of arbitration awards. Accordingly, the circuit court's "modification" could be viewed as no more

than a recognition of the legal "given," which would obtain even if left unstated, that Aloha was duty-bound to comply with the arbitration award only to the extent that it would not be obligated to perform an illegal act. After all, in theory, every arbitration award could properly be conditioned by a general statement—arguably surplusage insofar as it merely stated the common law—to that effect.

For purposes of resolving Aloha's fourth point of error on appeal, we need not decide—and therefore leave for another day— the intellectually tantalizing question whether the circuit court's "modification" of Tsukiyama's arbitration award was really a "clarification," because, consonant with the *Excelsior* principles and on the record before us, the circuit court's orders fully comported with HRS ch. 658 under either interpretation. Accordingly, we hold that the circuit court's October 28, 1992 confirmation orders did not err in "modifying" the arbitration award, notwithstanding that no motion to modify the award, pursuant to HRS § 658-10, had been filed by either party.

## IV. CONCLUSION

For the foregoing reasons, the circuit court's orders granting Mathewson's motions to confirm—and denying Aloha's motions to vacate—the arbitration award are affirmed.